UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:18-CR-81-REW-MAS |
| | ) | |
| v. | ) | |
| | ) | OPINION & ORDER |
| BENIAMIN-FILIP OLOGEANU, | ) | |
| ANDREI-CATALIN STOICA, | ) | |
| LIVIU-SORIN NEDELCU, | ) | |
| BOGDAN-STEFAN POPESCU, and | ) | |
| VLAD-CALIN NISTOR, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Before the Court are two dismissal motions premised on constitutional (DE 456), jurisdictional, and venue arguments (DE 459). Before turning to the pending requests, some background.

The operative indictment in this matter alleges a lengthy international RICO conspiracy. *See* DE 249 (Superseding Indictment) (hereinafter the "Indictment"). Specifically, the document charges that Defendants Stoica, Nedelcu, Popescu, Nistor, Ologeanu, (the "Movants") and 12 of their co-Defendants were "members and associates of a criminal organization" termed the "Alexandria Online Auction Fraud Network[.]" *Id.* at ¶ 1. Per the charging instrument:

> [AOAF Network] leaders, members, and associates engaged in, among other things, acts of mail and wire fraud, money laundering, identity theft, and counterfeit trademark trafficking. These acts were committed in furtherance of a wide-scale online auction fraud scheme, that is, posting false advertisements for goods online, often using stolen identities and trademarks from legitimate online auction companies, with the intent to defraud United States-based victims out of money and laundering the money through channels in the United States and ultimately Eastern Europe.

1

*Id.* Under this overarching theory, the Indictment charges the Movants and 12 others with conspiring—between December 31, 2013, and December 11, 2018—to operate a criminal enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). *Id.* at ¶¶ 7–29 (Count 1).[1] The Court, for current purposes, declines a full summary of the 90-page Indictment. However, as relevant to the Movants, the following additional charges pertain:

— Defendant Stoica is charged with conspiring from September 2, 2015, through December 11, 2018, to commit wire fraud, in violation of 18 U.S.C. § 1349, *id.* at ¶¶ 30–42 (Count 2), and four types of money laundering, all in violation of 18 U.S.C. § 1956(h), *id.* at ¶¶ 43–49 (Count 3); as well as two discrete—June 10 and June 25, 2016—acts of aggravated identity theft, each in violation of 18 U.S.C. § 1028A, *id.* at ¶¶ 50–51 (Counts 4 & 5).

— Defendant Nedelcu faces charges of conspiring, from May 2, 2015, through January 2018, to commit wire fraud, in violation of 18 U.S.C. § 1349, *id.* at ¶¶ 69–78 (Count 8); and conspiring, from May 2, 2015, through January 2017, to commit four types of money laundering, all in violation of 18 U.S.C. § 1956(h), *id.* at ¶¶ 79–85 (Count 9).

— Defendant Popescu is charged with conspiring, from December 31, 2013, through December 11, 2018, to commit wire fraud, in violation of 18 U.S.C. § 1349, *id.* at ¶¶ 164–72 (Count 19).

— Defendants Popescu and Nistor are charged with conspiring, from October 30, 2015, through October 2017, to commit four types of money laundering, all in violation of 18 U.S.C. § 1956(h), *id.* at ¶¶ 173–78 (Count 20).

— Defendant Ologeanu faces charges of conspiring, from December 13, 2013, through September of 2017, to commit wire fraud, in violation of 18 U.S.C. § 1349, *id.* at ¶¶ 179–89 (Count 21); and conspiring, from December 13, 2014, through September 2017, to commit four types of money laundering, all in violation of 18 U.S.C. § 1956(h), *id.* at ¶¶ 190–97 (Count 22).

[The conduct undergirding each charge allegedly occurred in this federal District and elsewhere.

*See id.* at ¶¶ 8, 32, 44, 50–51, 71, 80, 165, 174, 181 & 191.] The Movants' (and 2 co-Defendants')

---

[1] Seven of the movants' alleged co-conspirators have entered guilty pleas to the charged RICO conspiracy. *See* DE 302, 326, 327, 363, 382, 452 & 488 (Plea Agreements). Two other co-Defendants pleaded guilty to a nearly identical (at least substantively) RICO charge prior to the grand jury's return of the current charging document. *See* DE 218 & 242 (Plea Agreements); DE 1 (Original Indictment). Three individuals charged with AOAF participation are not yet before the Court; two more (Iossifov and Brown) did not join the pending defensive motions.

jury trial is currently set for June 15, 2020. *See* DE 500. With the general case backdrop in mind, the Court turns to the pending requests.

## I.    OLOGEANU'S MOTION

Defendant Ologeanu (joined by Defendants Stoica, Nedelcu, and Popescu)[2] seeks dismissal, per criminal Rule 12(b)(1),[3] on due process and Sixth Amendment grounds. *See* DE 456-1. Movant contends that witness testimony and documentary proof necessary for him to present a constitutionally complete defense are unavailable to him and beyond the Court's subpoena powers. *See id.* The motion—fully briefed, *see* DE 523 (Response), DE 541 (Reply)— stands ripe for review. The Court, for the following reasons, finds that Defendant fails to substantiate any constitutional infirmity and thus **DENIES** DE 456.

*Compulsory Process & Complete Defense*

Ologeanu's theory centers on his undoubted constitutional right to "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 104 S. Ct. 2528, 2532 (1984); *cf. Strickland v. Washington*, 104 S. Ct. 2052, 2063 (1984) ("The Constitution guarantees a fair

---

[2] The Court previously granted these Defendants' joinder motions. *See* DE 464, 467 & 477 (Motions); DE 472 & 485 (Orders). Neither Stoica nor Popescu made a distinct argument, so each gets an undifferentiated ruling. Defendant Nedelcu filed a separate memorandum in support. *See* DE 492. Nedelcu's filing differs only as to what information he claims is inaccessible; the underlying legal argument is substantively identical. *See id.* at 2–3, 11. The nature of purportedly unreachable proof is, as the discussion will show, mostly immaterial to the Court's decisional basis (and the Court, on review of Nedelcu's filing, sees no allegation regarding any unique foreign proof necessitating separate analysis). Thus, the Court directly analyzes Ologeanu's motion, but the rationale and conclusions apply with equal force to Nedelcu's arguments.

[3] Defendant (on the current briefing) does not argue that the operative Indictment lacks "the elements of the offense[s] charged[,]" or fails to "fairly inform[ ]" Movant of "the charge[s] against which he must defend[,]" or is inadequate to trigger double jeopardy protections. *Hamling v. United States*, 94 S. Ct. 2887, 2907 (1974) (describing requisites for a "sufficient" indictment); *see* Fed. R. Crim. P. 12(b)(3)(B). Thus, the motion falls under Rule 12(b)(1)'s general authorization for parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."

trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment[.]"). To protect that right, the Supreme Court has developed jurisprudence "in what might loosely be called the area of constitutionally guaranteed access to evidence[.]" *United States v. Valenzuela-Bernal*, 102 S. Ct. 3440, 3446 (1982). One such guarantee is an accused's right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI.

*The Right is Not Boundless*

Broadly, Defendant's theory is that this Court lacks the authority to subpoena needful evidence (primarily foreign witness testimony but also documents abroad) for his defense, and that a trial absent such overseas proof would be constitutionally infirm. It is true that neither the relevant criminal rules or statute permits this Court to secure the at-issue witnesses or the subject proof. *See* 28 U.S.C. § 1783 (limiting extraterritorial subpoena power, in relevant part, to "a national or resident of the United States who is in a foreign country"); Fed. R. Crim. P. 17(e); *cf. United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984) ("In the first place, being Swiss nationals in Switzerland, they were not amenable to service of United States process, either by statute or treaty."). However, Movant incorrectly concludes that the described inaccessibility implicates his compulsory process or due process rights.

Per the Supreme Court, "more than the mere absence of testimony is necessary to establish a violation of the" Sixth Amendment's "compulsory process" guarantee. *Valenzuela-Bernal*, 102 S. Ct. at 3446. "[A] defendant is only entitled to compulsory process when it is within the power

of the government to provide such process." *United States v. Epskamp*, No. 15-2028-CR, 2016

WL 4191126, at *2 (2d Cir. Aug. 5, 2016).[4] As the Fourth Circuit ably explained:

> A criminal defendant's right to compulsory process is not unlimited. Few rights, to be sure, are more fundamental than that of an accused to present witnesses in his own defense, and the right to compulsory process is imperative to the function of courts in our adversary system. But the right to compulsory process does not scorn practicality. Crucially, the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses. In concrete terms, the right to compulsory process is circumscribed by the ability of the district court to obtain the presence of a witness through service of process.

*United States v. Beyle*, 782 F.3d 159, 170 (4th Cir. 2015) (citations, quotation marks, and

alterations omitted). In short, the defense accurately observes that this Court likely lacks authority

to <u>compel</u> production of the at-issue proof; but, that argument illustrates a boundary, rather than a

violation of the compulsory process right on which Defendant relies. *See id.* at 170 ("A conviction

---

[4] The Sixth Circuit has not directly adopted this rule. *But see United States v. Damra*, 621 F.3d 474, 489 (6th Cir. 2010) ("[I]n order to demonstrate that the government has violated his right of compulsory process, a defendant must first make an initial showing that **the government has acted** in bad faith[.]" (emphasis added)); *United States v. Skaggs*, 327 F.R.D. 165, 171 (S.D. Ohio 2018) ("While the Sixth Circuit did not expressly characterize a government act or omission affecting witness availability as the trigger for the *Damra* analysis, the text of *Damra* supports this conclusion, because the Sixth Circuit qualified its two-part test by stating that it applies 'in the context of deported witnesses.'" (quoting *Damra*, 621 F.3d at 489)). However, the Circuits that have addressed the topic are unanimous. *United States v. Moussaoui*, 382 F.3d 453, 463 (4th Cir. 2004) ("The compulsory process right is circumscribed, however, by the ability of the district court to obtain the presence of a witness through service of process."); *United States v. Theresius Filippi*, 918 F.2d 244, 247 (1st Cir. 1990); *United States v. Sensi*, 879 F.2d 888, 899 (D.C. Cir. 1989) ("It is well settled that a defendant's inability to subpoena foreign witnesses is not a bar to criminal prosecution."); *United States v. Zabaneh*, 837 F.2d 1249, 1259–60 (5th Cir. 1988); *United States v. White*, 562 F.2d 587, 589 (8th Cir. 1977); *United States v. Greco*, 298 F.2d 247, 251 (2nd Cir.), *cert. denied*, 82 S. Ct. 831 (1962); *see also United States v. Ismaili*, 828 F.2d 153, 159 (3d Cir. 1987) ("We are referred, however, to no case which holds or even suggests that when witnesses are located outside the subpoena power of the court, the 'compulsory process' clause guarantees the defendant the right to take their depositions."). Defendant offers no reason to believe the Sixth Circuit would, if directly confronting the question, differ. *Cf. Beydoun v. Sessions*, 871 F.3d 459, 467 (6th Cir. 2017) ("A fundamental right will only be implicated by **government action** that, at a minimum, significantly interferes with the exercise of a fundamental right." (quotation marks omitted) (emphasis added)).

does not become unconstitutional simply because the federal courts lack power to secure the appearance of a foreign national located outside the United States."); *cf. United States v. Bryan*, 70 S. Ct. 724, 730 (1950) ("[P]ersons summoned as witnesses by competent authority have certain minimum duties and obligations[,] . . . which every person **within the jurisdiction of the Government** is bound to perform when properly summoned." (emphasis added)).

Critically, Defendant does not allege that any Government misfeasance or nonfeasance denies him the proof he seeks. Governmental action or inaction causally linked to the alleged deprivation is an axiomatic predicate for a cognizable constitutional claim. *See, e.g.*, *Valenzuela-Bernal*, 102 S. Ct. at 3447–48 ("[I]nterests protected by the Sixth Amendment look to the degree of prejudice incurred by a defendant as a result of **governmental action or inaction**." (emphasis added)); *United States v. Marion*, 92 S. Ct. 455, 466 (1971) ("Nor have appellees adequately demonstrated that the pre-indictment delay **by the Government** violated the Due Process Clause. No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them." (emphasis added)); *Brady v. Maryland*, 83 S. Ct. 1194, 1196–97 (1963) (holding that "**suppression by the prosecution** of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment" (emphasis added)). Because Ologeanu fails to show "that the government holds some degree of power over the foreign [proof's] availability," Movant's argument fails from the jump. *See Skaggs*, 327 F.R.D. at 171.

### Bad Faith is Required When the Right Applies

Moreover, a Government act or omission that contributes to a witness's (or other proof's) placement beyond a court's power—*i.e.*, a circumstance (not present here) in which a court could,

absent executive-branch hurdles, have compelled the witness's appearance[5]—is not ipso facto a constitutional infringement. Rather, a defendant claiming a violation of "his right of compulsory process . . . must first make an initial showing that the government has acted in bad faith, and . . . must then make some plausible showing that the testimony of the [unreachable] witness would have been both material and favorable to his defense." *Damra*, 621 F.3d at 489–90.[6] Here, Ologeanu's claim turns on the Court's inability to compel production of the relevant proof.[7] Again, the defense does not peg its lack of access to <u>any</u> Government act or omission, much less one tainted by bad-faith. Thus, even if the compulsory process right were properly implicated on this

[5] The cases present two general scenarios: The Government ordered the potential witness deported or denied access to the country for a witness willing to appear. *See Valenzuela-Bernal*, 102 S. Ct. at 3448 ("deported witnesses"); *Damra*, 621 F.3d at 489 ("deporting a potential witness"); *Theresius Filippi*, 918 F.2d at 247 (witness "would have willingly appeared at trial but was unable on his own to overcome the immigration hurdles blocking his entry into the United States").

[6] Ologeanu attempts to distinguish *Damra* on the hypothesis that "United States district courts are the only available venue for prosecution of the allegedly criminal conduct at issue there[,]" while Movant's alleged crimes, if dismissed, "would likely result in a prosecution in Romania[.]" DE 541 at 5–6. This argument is unavailing for multiple reasons. Among them: (1) Defendant fails to show that availability of an alternative venue was relevant to *Damra*'s rationale; (2) *Damra* does not once mention the word 'venue,' *see generally*, 621 F.3d 474; and (3) Defendant offers naught but *ipse dixit* to show that dismissal here would "likely" lead to a Romanian prosecution. DE 541 at 6. [Ologeanu's speculation regarding a possible Romanian venue is also somewhat contrary to Co-Defendant Nistor's view that the acts alleged in the Indictment were "compliant with Romanian law." DE 459-1 at 13; *see also id.* ("[T]here is no allegation that Romanian authorities have pursued, or are pursuing, any criminal charges . . . related to this case.").] Movant's conjecture regarding the availability of an alternative foreign venue—an issue of dubious relevance to the constitutional claim undergirding Ologeanu's motion—hardly justifies the "extraordinary remedy of dismissal of the indictment[.]" *United States v. Talbot*, 825 F.2d 991, 998 n.5 (6th Cir. 1987). Taken too far, the argument would result in international crimes being triable nowhere.

[7] The relevant cases directly address witnesses. However, key rulings, *Valenzuela-Bernal* and *Damra*, foundationally rely on caselaw generally applicable to governmental acts that deprive a defendant of access to potentially exculpatory proof. *See Valenzuela-Bernal*, 102 S. Ct. at 3447– 48 (citing, among others, *Brady v. Maryland*, 83 S. Ct. 1194 (1963) and *Roviaro v. United States*, 77 S. Ct. 623 (1957)); *Damra*, 621 F.3d at 488–89 (describing the DNA destruction ruling in *Arizona v. Youngblood*, 109 S. Ct. 333 (1988) as having "powerful implications for" compulsory process claims). Thus, the Court sees no reason to doubt that the three-fold requirements of bad faith, materiality, and favorability broadly apply to topics within the so-called "area of constitutionally guaranteed access to evidence." *Damra*, 621 F.3d at 489 (citation omitted).

record (and again, it is not), Movant would falter at *Damra*'s first prong. To be clear, Defendant's inability to show bad faith does not merely foreclose the dismissal request, it fatally undermines the basis for that request; that is, Defendant shows no constitutional infirmity.[8]

*Additional Notes*[9]

Though not necessary to the result, the Court notes several additional deficiencies in Ologeanu's argument. First, despite limitations on the Court's subpoena authority, the law does provide mechanisms—*e.g.*, letters rogatory or depositions—for securing foreign proof. *See* DE 523 at 12–13; 28 U.S.C. § 1781(b)(2) (discussing "transmittal or a letter rogatory or request directly from a tribunal in the United States to [a] foreign or international tribunal, officer, or agency"); Fed. R. Crim. P. 15(a) (A "court may grant [a] motion" to depose a prospective witness based on "exceptional circumstances and in the interest of justice" and "may also require the

---

[8] For this reason, Ologeanu's resort to arguments concerning relative inadequacy of Government-proposed alternative access processes do not advance the dismissal theory. *See* DE 541 at 5–6. It is true that no amount of process may cure an inadequately tailored deprivation of fundamental liberty interests. *See id.* Such a deprivation, however, is precisely what Movant fails to substantiate.
[9] Defendant's reply, for the first time and thus improperly, also asserts *forum non conveniens* and pursues a venue change of sorts. DE 541 at 9; *see Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 275 (6th Cir. 2010) ("Arguments raised only in reply . . . are not properly raised before the district court[.]"). Ologeanu's motion is for dismissal based on alleged violations of his due process and Sixth Amendment rights, *see* DE 456, and his initial argument unambiguously pursued same. *See, e.g.*, DE 456-1 at 1 (contending that allowing the prosecution to continue "would result in violations of the rights afforded him by the United States Constitution"), 18 (concluding that "the ability of Ologeanu to compel witnesses and the production of documents [ ] are essential to his constitutional rights to present a complete defense"). Defendant's change in tack at the close of briefing denied the Government the opportunity to address the propriety of the alternative relief request. The Court declines to substantively consider the merits of tardily requested forum or venue relief in the context of a motion for dismissal on constitutional grounds. [And, in any event, Ologeanu fails to identify any more convenient venue to which this Court could transfer the matter. Rule 21(b) does not authorize transfers to Romania. *See* Fed. R. Crim. P. 21(b) (permitting transfer to "another **district**" (emphasis added)). Further, for the reasons discussed below regarding Nistor's motion, the defense fails to show that this District is an improper venue.]

deponent to produce" non-privileged documentary evidence.).[10] Defendant has sought no letters

rogatory and requested no Rule 15 depositions. Despite Movant's rhetorical reference to other

courts' recognition of **potential** limitations of letters rogatory, DE 541 at 4, Ologeanu has not

pursued them and thus can offer nothing but surmise regarding their efficacy in this matter. More

importantly, for present purposes, Movant's failure to *attempt* resort to these available mechanisms

sharply undercuts the assertion that the referenced proof is "essential[,]" "necessary[,]" or

"critical" to his defense. DE 456-1 at 1, 5, 18.[11] Defendant, it seems, advocates that the Constitution

demands dismissal based on perceived, but entirely untested inadequacy of available mechanisms.

The Court rejects that premise. *See Sensi*, 879 F.2d at 899 (finding that a defendant's failure to

"use all the means at his disposal to obtain the needed testimony"—including asking the trial court

for "permission to depose witnesses residing overseas" or "letters rogatory addressed to a court of

Kuwait"—"only serve[d] to undermine further his contention that the interests of justice compel a

new trial"); *cf. United States v. Brandenfels*, 522 F.2d 1259, 1263 (9th Cir. 1975) (finding

---

[10] *See also* Fed. R. Crim. P. 15(c)(3) (outlining findings required for "deposition of a witness who is outside the United States . . . taken without the defendant's presence"); *United States v. Steele*, 685 F.2d 793, 809 (3d Cir. 1982) ("Fed. R. Crim. P. 15(d) directs that depositions are to be taken in the manner provided in civil actions, and Fed. R. Civ. P. 28(b)(3) authorizes the taking of depositions in foreign countries 'pursuant to a letter rogatory.'").

[11] Initially, Ologeanu based his claim on "exclusion of critical evidence, coupled with the inability to cross-examine and illicit testimony of relevant witnesses[.]" DE 456-1 at 5. Available mechanics, though unpursued, have the potential to cure at least two of Defendant's concerns— permitting admission of such evidence and providing the ability to illicit testimony. In reply, Defendant shifts gears to argue, essentially, that his concern is *really* about a "heightened" need for live testimony in this particular case. DE 541 at 4. To be sure, "[t]he law prefers live testimony over hearsay[.]" *Steele v. Taylor*, 684 F.2d 1193, 1202 (6th Cir. 1982). However, Ologeanu presents no support for his claim that the preference is 'heightened' as a constitutional principle in this matter. Defendant also references "the importance of cross examination[.]" DE 541 at 3 (quoting *White v. Illinois*, 112 S. Ct. 736, 743 (1992)). Yet, Ologeanu does not explain why he would be cross-examining a witness he wishes to call. Defendant entirely fails to show that Rule 15 depositions (potentially video-recorded) could not adequately substitute for live testimony in the unique circumstances of this case. And, of course, for the reasons already detailed, Defendant fails to show that the Constitution requires the particular live testimony he seeks.

supportive of continuance denial that "the defense, having known of [the witness's] whereabouts and the potential difficulty in securing his presence at trial, had made no motion to take his deposition although this was a possible course of action under Rule 15 of the Federal Rules of Criminal Procedure.").

The Court does not reach the materiality or favorability questions,[12] but notes that much of the proof Ologeanu identifies as critical would likely not be amenable to process with the level of detail provided, *see* DE 456-1 at 18, even if it were located domestically.[13] *See United States v. Rogers*, 769 F.3d 372, 379 (6th Cir. 2014) (finding that "the district court did not abuse its wide discretion in denying" a motion for subpoenas that "contained only broad, nonspecific statements about the witnesses and their usefulness and failed to in any way describe[, *inter alia*,] who the Witnesses are"); *United States v. Washington*, No. 2:16-CR-00279-JAD-PAL, 2018 WL 894027, at *3 (D. Nev. Feb. 13, 2018) ("Pursuant to Rule 17(d), a subpoena must be served personally on a witness. *Ferrari v. United States*, 244 F.2d 132, 141 (9th Cir. 1957). . . . Thus, the court may deny issuance of a subpoena where the witnesses cannot be located."); *see also Thor v. United States*, 574 F.2d 215, 220 (5th Cir. 1978) ("[W]here a witness cannot be located, there is no error in denying a subpoena."); *United States v. Schembari*, 484 F.2d 931, 936 (4th Cir. 1973) ("Here, the fact that the trial judge was presented with requests for 'John and Jane Doe' subpoenas *duces tecum* cannot be squared with the language of Rule 17(b) which limits the discretion of the trial

---

[12] The Court has authority "to make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motion as long as the court's findings on the motion do not invade the province of the jury." *United States v. Craft*, 105 F.3d 1123, 1126 (6th Cir. 1997). Given the legal inadequacy of Defendant's theory, the Court sees no need to test that line here.

[13] To obtain access to documentary materials under Rule 17, a defendant "must show that (1) the subpoenaed document is relevant, (2) it is admissible, and (3) it has been requested with adequate specificity." *United States v. Arditti*, 955 F.2d 331, 345 (5th Cir. 1992) (citing *United States v. Nixon*, 94 S. Ct. 3090, 3103 (1974)). "These specificity and relevance elements require more than the title of a document and conjecture as to its contents." *Id.*

court to issue subpoenas 'on . . . *named* witness[es].'" (emphasis in original)); *United States v. Cuthbertson*, 630 F.2d 139, 146 (3d Cir. 1980) ("[M]ere hope that some exculpatory material might turn up" is insufficient to justify enforcement of a Rule 17(c) subpoena.); *cf. Bowman Dairy Co. v. United States*, 71 S. Ct. 675, 679 (1951) ("Rule 17(c) was not intended to provide an additional means of discovery."). Additionally, Ologeanu's exculpatory impact hypothesis for certain testimony depends on individuals expressly inculpating themselves (if not as Johnla73—Defendant's alleged online handle—directly, at least as involved in the charged conspiracy). *See, e.g.*, DE 541 at 8 (discussing "Mr. Chioru"). Yet, Defendant offers nothing to suggest such witnesses would waive their Fifth Amendment privilege and confess felony liability. *See Brandenfels*, 522 F.2d at 1263 ("Furthermore, there were no assurances that [the proposed witness], even if available, would waive his Fifth Amendment privilege against self-incrimination in order to testify for [the defendant].").

Further, though a defendant surely has the right to present evidence, in a proper form,[14] of a pertinent character trait,[15] Ologeanu does not identify any particular witness, specify a germane character trait or allege the content of testimony any character witness might offer. *Cf. Damra*, 621 F.3d at 490 ("[T]he defendant's unsupported word alone is not sufficient to demonstrate materiality and favorability where the defendant maintains only that the potential witness 'could

---

[14] *See Michelson v. United States*, 69 S. Ct. 213, 219 (1948) ("The witness may not testify about defendant's specific acts or courses of conduct or his possession of a particular disposition or of benign mental and moral traits; nor can he testify that his own acquaintance, observation, and knowledge of defendant leads to his own independent opinion that defendant possesses a good general or specific character, inconsistent with commission of acts charged. The witness is, however, allowed to summarize what he has heard in the community, although much of it may have been said by persons less qualified to judge than himself.").

[15] *See, e.g.*, *United States v. Daulton*, 266 F. App'x 381, 386 (6th Cir. 2008) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant. . . . Evidence of noncriminal activities would only be relevant if the indictment charged the defendants with ceaseless criminal conduct.").

explain' or 'might have testified' in some favorable fashion." (citation omitted)). Given the categories of individuals from which Defendant suggests he might obtain such testimony—*see* DE 456-1 at 11 ("friends, family, neighbors[,] and co-workers")—this deficiency is stark. *See Rogers*, 769 F.3d at 379 (finding "generalized assertions . . . about the content of [ ] testimony" insufficient to require further favorability inquiry). Also problematic, given the relationships to Ologeanu of the contemplated character witnesses, Defendant fails to explain why such individuals would not, or could not, voluntarily appear. *Cf. Ismaili*, 828 F.2d at 160 ("There was no evidence offered that either [witness] had tried and was in fact unable to procure a passport or would refuse or was unable to attend trial in the United States.").

*Sub-Conclusion*

In sum, the right to compulsory process does not stretch to proof outside the Court's reach; when the Government has no part in rendering such evidence inaccessible, there is no constitutional violation.[16] *See Beyle*, 782 F.3d at 171 ("[E]xogenous difficulties" in obtaining extraterritorial proof "need not halt the operations of the criminal justice system in the United States. This is especially the case where the immediate obstacles are not of the government's making."). This fatal flaw in Ologeanu's foundational legal predicate independently justifies denial

---

[16] On this record, the Court sees no need for any additional or distinct Fifth Amendment analysis. Ologeanu's claim relies on purportedly unavailable, extraterritorial proof. Defendant does not develop any argument that a trial without access to such proof might violate his Fifth Amendment rights despite fully afforded Sixth Amendment rights. Put differently, beyond the lack of compulsory process for extraterritorial proof, Movant identifies no "element[ ] of a fair trial" that an adjudication in the current posture might lack. *See See Chambers v. Mississippi*, 93 S. Ct. 1038, 1045 (1973). This is hardly surprising, as the Constitution, though guaranteeing "a fair trial through the Due Process Clauses," largely "defines the basic elements of a fair trial [ ] through the several provisions of the Sixth Amendment[.]" *Strickland*, 104 S. Ct. at 2063. Thus, the Court's rejection of the compulsory process claim likewise justifies rejection of the linked but nonspecific due process theory. Further, the Court notes that the Supreme Court has found that a court's inability "to compel the attendance of witnesses who are beyond [that sovereign's territorial] limits" does not violate due process. *Minder v. State of Ga.*, 22 S. Ct. 224, 225 (1902).

of the motion. Yet, even if Movant had shown, counter-factually, that the Government had a hand in placing proof beyond the Court's subpoena powers, Defendant does not claim, much less show bad faith. Thus, had Ologeanu done enough to trigger the *Damra* test, he patently fails to make the predicate bad-faith showing that binding Sixth Circuit precedent requires of a defendant claiming a compulsory process violation. *Damra*, 621 F.3d at 489.[17] For all these reasons, the Court **DENIES** DE 456.

## II. NISTOR'S MOTION

Defendant Nistor (joined by Defendants Ologeanu, Stoica, Nedelcu, and Popescu)[18] seeks dismissal, per criminal Rule 12(b),[19] on four grounds. *See* DE 459-1 (Mem. in Support). Specifically, Nistor claims: (1) this District is a constitutionally improper venue; (2) the laws he is charged with violating do not apply to extraterritorial conduct; (3) bitcoin transfers are not proper subjects for prosecution under the § 1956 money laundering suite; and (4) the instant prosecution

---

[17] Ologeanu's meandering reply suggests that his theory "implicates" some fundamental liberty interest other than compulsory process. *See* DE 541 at 5–7. Yet, Defendant, after reciting substantive due process standards, fails to identify any such interest. *See id.* Perhaps Ologeanu is alleging that the right to a "complete defense" extends beyond the right to compulsory process. The cases vary as to the source for the "complete defense" right. Some peg the issue as a due process matter; others trace the right to the Sixth Amendment. *See Chambers*, 93 S. Ct. at 1049 (1973); *Washington v. Texas*, 87 S. Ct. 1920, 1925 (1967). The *Crane* Court saw no need to precisely pin down the source. *Crane v. Kentucky*, 106 S. Ct. 2142, 2146 (1986). So too here. The Court has no doubt that the right to a complete defense might theoretically be jeopardized in numerous ways. Yet, Movant fails to develop any argument that a prosecution would infringe any specific aspect, other than compulsory process, of the complete defense right. Thus, Ologeanu's aimless substantive due process contentions warrant no further analysis. *See United States v. Crumpton*, 824 F.3d 593, 619 n.7 (6th Cir. 2016) ("[I]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (citation and quotation marks omitted)).

[18] The Court previously granted these Defendants' joinder motions. *See* DE 463, 466, 469 & 478 (Motions); DE 472 & 485 (Orders). No joining Defendant made a distinct argument, so each gets an undifferentiated ruling.

[19] Subsection (b)(2) authorizes a motion for lack of jurisdiction; Subsection (b)(3)(A)(i) authorizes pretrial motions alleging "improper venue[.]" Fed. R. Crim. P. 12(b).

violates due process. *See id.* The motion—fully briefed, *see* DE 525 (Response), DE 540 (Reply)—stands ripe for review.[20] The Court, for the following reasons, rejects each of Nistor's arguments and thus **DENIES** DE 459.

*Venue*

"The Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed[.]" U.S. Const. art. III, § 2; *see also* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law[.]"); Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."). To determine the "*locus delicti*" of a charged offense, and thus the proper venue, courts look to "the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Cabrales*, 118 S. Ct. 1772, 1776 (1998) (quoting *United States v. Anderson*, 55 S. Ct. 1213, 1216 (1946)).

Nistor is charged with knowing participation in a money laundering conspiracy under 18 U.S.C. § 1956.[21] As to venue, the statute provides, "a prosecution . . . may be brought in . . . any

---

[20] It is noteworthy, to the Court, that Nistor devotes his reply almost entirely to argument that the Government's "allegations misunderstand and misconstrue the import and impact of legislative acts taken by the European Union[.]" DE 540 at 2. This argument is, at best, theoretically relevant only to Defendant's due process challenge.

[21] Defendant concedes that the money laundering charge constitutes an alleged "predicate act for the RICO charge[.]" DE 459-1 at 7. Thus, the Court focuses its venue analysis on the laundering conspiracy. If venue is proper for that charge, there is no distinct RICO venue issue. *See* Fed. R. Crim. P. 18; 18 U.S.C. § 3237(a) ("[A]ny offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."); *United States v. Myers*, 854 F.3d 341, 351 (6th Cir. 2017) ("The Supreme Court has [ ] repeatedly approved as constitutionally permissible the prosecution of a crime in a district in which the crime was committed only in part.").

[ ] district where an act in furtherance of the . . . conspiracy took place." 18 U.S.C. § 1956(i)(2).[22]

As a constitutional matter, "where a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done." *United States v. Rodriguez-Moreno*, 119 S. Ct. 1239, 1244 (1999) (quoting *United States v. Lombardo*, 36 S. Ct. 508 (1916)). In a conspiracy case, venue is proper in a district in which a co-conspirator acted in furtherance of the scheme. *See United States v. Jordan*, 511 F. App'x 554, 566 (6th Cir. 2013) (co-conspirators' delivery of marijuana, "purchased with money obtained from drug sales," to Tennessee and trafficking-funded Tennessee property investments justified Tennessee venue for Arizona-based defendant); *United States v. Nichols*, 416 F.3d 811, 824 (8th Cir. 2005) (upholding Missouri venue for money laundering prosecution in which California-based defendant "was charged with a conspiracy linking him to fraudulent acts committed in Missouri"). Further, the fact that a defendant never entered the prosecuting district during commission of the offense is of no constitutional moment for venue purposes. *See Palliser v. United States*, 10 S. Ct. 1034, 1037 (1890) (affirming propriety of Connecticut venue for prosecution of New York mailer for letter sent to Connecticut); *see also Armour Packing Co. v. United States*, 28 S. Ct. 428 (1908) ("[T]ransportation being of the essence of the offense, when it takes place, whether in one district or another, whether at the beginning, at the end, or in the middle of the journey, it is equally and at all times committed.").

Here, Nistor claims improper venue because he, personally, did not act or intend harm in this District. *See* DE 459-1 at 7. Yet, a procedurally sound prosecution for "conspiracy does not

---

[22] For a substantive money laundering offense, the statute authorizes venue in "(A) any district in which the financial or monetary transaction is conducted; or (B) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted." 18 U.S.C. § 1956(i)(1).

always require the presence of a co-conspirator[,]" much less the Defendant himself, "in the venue." *United States v. Elliott*, 876 F.3d 855, 862 (6th Cir. 2017). The Government claims it has proof that: (1) victims in this District were defrauded into giving funds to AOAF Network members; (2) Network members "directed communications to, and requested funds from" a Kentucky-based CS;[23] (3) "victim funds were regularly converted into bitcoin in the EDKY before being remitted back to the defendants in Eastern Europe"; and (4) "that victim funds that were ultimately laundered by Nistor flowed through a coconspirator in the EDKY to bitcoin addresses controlled by Popescu[.]" DE 525 at 7–8. It remains to be seen (and is a trial matter) whether the Government's trial proof ultimately bears out these allegations. However, on this record, the prosecution has alleged Nistor's involvement in a conspiracy involving in-District victims, in-District processing (and laundering) of fraud proceeds, and an in-District operative. *See United States v. Rosa*, 17 F.3d 1531, 1541 (2d Cir. 1994) ("With respect to a charge of conspiracy, venue may properly be laid . . . in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators."). If the Government proves its theory,[24] then Defendant "having concocted a scheme that relied . . . on the actions of district residents for its success can hardly complain that [his] very *modus operandi* subjected [him] to prosecution in numerous districts, including the Eastern District of [Kentucky]." *Elliott*, 876 F.3d at 862 (quoting *United States v. Royer*, 549 F.3d 886, 895 (2d Cir. 2008)) (quotation marks and alteration omitted). The laundering count alleges a direct link to in-District conduct by the CS involving receipt and transfer

---

[23] "A conspirator acting alone, with an unwitting third party or with a government agent, may take acts in furtherance of the conspiracy sufficient to support venue. . . . To determine whether venue is proper we ask not whether all of the elements of a conspiracy were committed in the district of venue, but rather, whether a conspirator committed an act in furtherance of the conspiracy in that district." *United States v. Gonzalez*, 683 F.3d 1221, 1225 (9th Cir. 2012).

[24] To be clear, the Court takes no position as to whether that will come to pass. The trial will tell it.

of victim money. DE 249 at ¶ 176. The funds generation plainly involved alleged intra-District behavior, as next discussed.

Moreover, the Indictment charges Nistor with knowing participation in the RICO conspiracy. Movant's charged co-conspirators allegedly committed acts in furtherance of the conspiracy in this District—*e.g.*, Defendants Stoica, Popescu, or Ologeanu, allegedly communicated directly with (or received funds straight from) individuals in this District, *see* DE 249 at ¶¶ 29(a), 84, 176. Meaning, for venue purposes, Defendant is "charged with the anterior [Kentucky-based] criminal conduct that yielded the laundered proceeds[.]" *Myers*, 854 F.3d at 353. The in-District fraud allegations tether the conspiracy and, through attendant principles, Nistor to this venue. *See id.* at 353–54 ("[A] conspiracy is a continuing offense that is committed everywhere the overt acts are committed."); *United States v. Aronds*, 210 F.3d 373 (table) (6th Cir. 2000) (distinguishing *Cabrales*, 118 S. Ct. 1772, and noting defendant was also charged "with complicity in the underlying activity that yielded the laundered funds"). As Judge Aldrich eloquently put it:

> [A] conspiracy is like a train. When a party knowingly steps aboard, he is part of the crew, and assumes conspirator's responsibility for the existing freight—or conduct—regardless of whether he is aware of just what it is composed.

*United States v. Baines*, 812 F.2d 41, 42 (1st Cir. 1987). The Government has alleged Movant's co-conspirators acted in furtherance of the charged conspiracy in the Eastern District of Kentucky and, thus (if proven), "venue in th[is] district [is] proper as to all co-conspirators, including [Nistor]." *United States v. Crozier*, 259 F.3d 503, 519 (6th Cir. 2001).

The Indictment alleges Nistor's involvement in two offenses that occurred "in the Eastern District of Kentucky and elsewhere[.]" DE 249 at ¶¶ 8, 174. Pretrial, and for purposes of a motion such as this, indictment allegations are generally accepted as true. *United States v. McAuliffe*, 490

F.3d 526, 531 (6th Cir. 2007).[25] Nistor offers nothing to displace that presumption. In short, the Government, for now, has done enough to avoid dismissal on venue grounds; the topic is for the trial. *See* Fed. R. Crim. P. 12(b)(3) (authorizing resolution of venue challenges if "the motion can be determined without a trial on the merits").[26]

### Jurisdiction & Extraterritoriality

Nistor next challenges the Court's jurisdiction over the charges. Per the Supreme Court, RICO "applies to foreign racketeering activity . . . to the extent that the predicates alleged in a particular case themselves apply extraterritorially." *RJR Nabisco, Inc. v. European Cmty.*, 136 S.

---

[25] A venue challenge alleges "a defect in instituting the prosecution," rather than "a defect in the indictment[.]" Fed. R. Crim. P. 12. However, Nistor offers no argument to explain why the presumption as to Indictment veracity should apply with any lesser force in the context of a venue dispute. *Cf. Kaley v. United States*, 134 S. Ct. 1090, 1097 (2014) ("An indictment fair upon its face, and returned by a properly constituted grand jury, . . . conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged." (alterations and quotation marks omitted)).

[26] "Venue is a question of fact, . . . which ordinarily must be decided by the jury." *United States v. Miller*, 111 F.3d 747, 749 (10th Cir. 1997) (citation and quotation marks omitted) (collecting cases). The Government need prove venue only "by a preponderance of the evidence[.]" *United States v. Crozier*, 259 F.3d 503, 519 (6th Cir. 2001); *see also United States v. Kelly*, 535 F.3d 1229, 1235 (10th Cir. 2008) ("There does not appear to be any direct evidence on the venue question, **but there need not be**." (emphasis added)). Given the presumptively valid indictment allegations, and the Court's severely circumscribed fact-finding authority at this stage, it is hardly surprising that district courts have found barebone indictment allegations, alone, sufficient to deny venue challenges. *See, e.g.*, *United States v. Ayeki*, 289 F. Supp. 2d 183, 188 (D. Conn. 2003) ("Since the indictment, on its face, properly alleges venue in the District of Connecticut, there is no basis at this stage for moving for dismissal because of improper venue."); *United States v. Austin*, 99 F.R.D. 292, 307 (W.D. Mich. 1983).

Ct. 2090, 2102 (2016). Thus, the jurisdictional dispute, at least as Nistor frames the argument,[27] comes down to whether Congress has given "a clear, affirmative indication that [§ 1956] applies extraterritorially." *Id.* at 2101.[28] With § 1956(f), the Legislature was lucent:

> There is extraterritorial jurisdiction over the conduct prohibited by this section if—
> (1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and
> (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

18 U.S.C. § 1956(f). When, as here, a statute has clear extraterritorial reach, a determination of its proper scope "turns on the limits Congress has (or has not) imposed on the statute's foreign application[.]" *Nabisco*, 136 S. Ct. at 2101. Nistor claims this prosecution violates the jurisdictional restriction to conduct that occurs at least partly in the United States.[29] This challenge, for much the same reasons as the venue argument, is meritless.

Whether or not Nistor **directly** participated in any US-anchored illicit transactions, the Indictment expressly alleges repeated involvement of purported co-conspirators in such transactions. As the Ninth Circuit once put it:

> The United States does not lack jurisdiction to prosecute [a] conspiracy . . . merely because some of the underlying conduct occurred overseas. The government has the power to prosecute every member of a conspiracy that takes place in United States territory, even those conspirators who never entered the United States.

---

[27] Given the venue analysis above, the Court is not convinced that jurisdiction over this prosecution necessarily requires resort to extraterritoriality principles. *Morrison v. Nat'l Australia Bank Ltd.*, cited by Nistor (DE 459-1 at 9–10), addressed a fraudulent transaction initiated domestically but occurring ultimately on a foreign exchange. 130 S. Ct. 2869, 2877 (2010). Here, the indictment alleges, as to multiple purported Nistor co-conspirators, extraterritorially initiated frauds targeting American victims, *see* DE 249 at ¶ 29(a), as well as wholly domestic laundering activity. *See id.* at ¶ 176 (charging that US-based co-conspirators "converted victim funds to bitcoin and sent that bitcoin back to co-conspirators located in Eastern Europe"). Nonetheless, given the parties' treatment, the Court engages in the exercise. *See* DE 525 at 10 n.3.

[28] The Court's affirmative finding on this question "obviate[s] *Nabisco* step two's 'focus' inquiry[.]" *Id.* at n.5.

[29] Nistor does not contend that the alleged transactions involve value (at or) less than $10,000.

19

*United States v. Sadighi*, 199 F.3d 1334 (table), 1999 WL 980661, at *3 (9th Cir. 1999); *see also United States v. Garcia*, 533 F. App'x 967, 982 (11th Cir. 2013) ("The requirements for extraterritorial jurisdiction [under § 1956(f)] were met here. The evidence showed that the transferred funds originated in the United States. Thus, a portion of each transaction occurred in the United States."); *United States v. Tronson*, 215 F.3d 1328 (table) (6th Cir. 2000) (rejecting argument "that the government lacked jurisdiction over [ ] money laundering offenses because some of the transactions originated or were completed outside of the United States").

Ultimately, Nistor's theory hinges on the claim that he "had no involvement in or awareness of" transactions involving "victim funds that originated" in America. DE 459-1 at 12. The argument, though surely a fair subject for a trial defense, ignores the Indictment. The Court, for purposes of the dismissal motion, accepts as true[30] the allegation that Nistor "knowingly . . . agreed" to participate in a conspiracy involving, for instance, fraud victim payments sent "to U.S.-based co-conspirators, who converted victim funds to bitcoin and sent that bitcoin back to co-conspirators located in Eastern Europe." DE 249 at ¶ 176; *see also id.* at ¶ 177 (charging, specifically, that Nistor "knew that he was exchanging bitcoin representing fraud proceeds to fiat currency"). The Indictment charges adequately supply, at this stage, the necessary jurisdictional hook. *See* 18 U.S.C. § 1956(f)(1) (establishing jurisdiction for prohibited conduct "that occurs in part in the United States").

---

[30] *See McAuliffe*, 490 F.3d at 531 ("The indictment must be read as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications. *United States v. Reed*, 77 F.3d 139, 140 n. 1 (6th Cir. 1996) (en banc). An indictment is to be construed liberally in favor of its sufficiency. *United States v. Davis*, 306 F.3d 398, 411 (6th Cir. 2002).").

*Bitcoin Transfers as Financial Transactions*

Section 1956, in relevant part, criminalizes certain "financial transactions" and specified transfers of "funds[.]" 18 U.S.C. § 1956(a)(1) & (2). In turn, a statutory "financial transaction" includes, *inter alia*:

> [A] transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft[.]

*Id.* at § 1956(c)(4). And, "monetary instruments" include:

> (i) coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery[.]

*Id.* at § 1956(c)(5). Nistor urges that the bitcoins he is accused of laundering are not funds, monetary instruments, or currency and, thus, a § 1956 prosecution cannot properly target transactions involving such "virtual currency." DE 459-1 at 13–14. The theory, for several reasons, is fatally flawed.

Defendant's argument, unburdened by caselaw citation, relies almost exclusively on an IRS Notice stating that "[f]or federal tax purposes, virtual currency is treated as property." IRS Notice 2014-21, 2014 WL 1224474 (2014). Nistor fails to explain why the IRS's interpretation of bitcoin tax status should control interpretation of the federal money laundering statute. Federal

courts have consistently and repeatedly rejected this theory.[31] In addition to the numerous cases

finding that bitcoin qualifies as money or funds under 18 U.S.C. § 1960, at least two courts have

concluded that bitcoin transactions are properly subject to money laundering prosecutions. *See

Budovsky*, 2015 WL 5602853, at *13–14; *Ulbricht*, 531 F. Supp. 3d at 569–70.[32] Again, Defendant

fails to cite a single contrary ruling. As *Ulbricht* explains:

> It is clear from a plain reading of the statute that "financial transaction" is broadly
> defined. *See United States v. Blackman*, 904 F.2d 1250, 1257 (8th Cir. 1990)
> (citation omitted). It captures all movements of "funds" by any means, or monetary
> instruments. "Funds" is not defined in the statute and is therefore given its ordinary
> meaning.

531 F. Supp. 3d at 570 (citing *Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S.Ct. 1997, 2002 (2012)).

Black's defines "funds" as "[m]oney or other assets, such as stocks, bonds, or working capital,

available to pay debts, expenses, and the like[.]" *Fund*, Black's Law Dictionary (11th ed. 2019)

(noting that the cited definition usually applies to the plural form); *see Fund*, *Webster's*

---

[31] *See, e.g.*, *United States v. Mansy*, No. 2:15-CR-198-GZS, 2017 WL 9672554, at *2 (D. Me. May 11, 2017) ("Defendants' most developed argument, that the IRS's treatment of virtual currency as 'property' means that virtual currency cannot be 'money' in other contexts, has been expressly and persuasively rejected by other courts."); *United States v. Murgio*, 209 F. Supp. 3d 698, 709 (S.D.N.Y. 2016) ("[T]he fact that the IRS treats virtual currency as 'property,' rather than 'currency,' for tax purposes is irrelevant to the inquiry here."); *United States v. Budovsky*, No. 13CR368 DLC, 2015 WL 5602853, at *14 (S.D.N.Y. Sept. 23, 2015) (describing IRS notice as "inapposite" and finding it does "not suggest that the term 'funds' should not be read to encompass virtual currencies"); *United States v. Ulbricht*, 31 F. Supp. 3d 540, 569 (S.D.N.Y. 2014) ("[N]either the IRS nor FinCEN purport to amend the money laundering statute (nor could they)."). As one district court noted: "In twenty-three places throughout the IRS Code, money is referred to as property. Thus, the Court finds no reason to conclude, based on IRS Notice 2014-21, that Bitcoin is not money. In fact, the IRS definition and guidance seem to point the Court towards the similarities between money and Bitcoin for federal tax purposes." *Sec. & Exch. Comm'n v. Shavers*, No. 4:13-CV-416, 2014 WL 12622292, at *6 (E.D. Tex. Aug. 26, 2014).

[32] *See also United States v. Day*, 700 F.3d 713, 726 (4th Cir. 2012) (rejecting defendant's argument that gold is not "funds" within the meaning of § 1956 and explaining that a contrary result "would turn the transportation money laundering statute on its head, creating an odd safe harbor for criminals to transport and conceal their criminal proceeds where they engage in *more* deceit and concealment, not less." (emphasis in original)).

*Unabridged Dictionary* (2001 ed.) (A fund is "a supply of money or pecuniary resources, as for some purpose[.]" Plurally, funds are "money immediately available" or "pecuniary resources[.]"). "Put simply, 'funds' can be used to pay for things in the colloquial sense. Bitcoins can be either used directly to pay for certain things or can act as a medium of exchange and be converted into a currency which can pay for things." *Ulbricht*, 31 F. Supp. 3d at 570.

In sum, the federal district courts have unanimously and univocally concluded that "Bitcoin constitutes 'money' and 'funds'[.]" *United States v. Stetkiw*, No. 18-20579, 2019 WL 417404, at *2 (E.D. Mich. Feb. 1, 2019). The Court joins the chorus and rejects Nistor's contrary theory.

*Due Process*

Last, Nistor contends that this prosecution violates his due process rights. Defendant's theory is, at bottom, an as-applied challenge to 18 U.S.C. § 1956.[33] Assuming that the Fifth

---

[33] The Circuits somewhat differ as to whether a due process attack challenges the Court's jurisdiction or "the substantive reach of the conduct elements of" the subject criminal statute. *United States v. Delgado-Garcia*, 374 F.3d 1337, 1343 (D.C. Cir. 2004); *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) (treating due process as requiring a proper "jurisdictional nexus"). For the present inquiry, the Court sees no meaningful difference whether Nistor's argument challenges § 1956(a) or § 1956(f).

Amendment limits Congressional authority to criminalize extraterritorial conduct,[34] the Court has

surveyed the various Circuit approaches to the analysis. Most overlap to varying degrees. *See, e.g.*,

*Al Kassar*, 660 F.3d at 118 (citing 9th Circuit's reliance on international law principle of

"[p]rotective jurisdiction" in the context of "nexus" analysis). The Court discerns three major

theories: the international law approach, the nexus approach, and the fundamental fairness

approach. Nistor's argument fails under each.

The First Circuit, "guided by principles of international law[,]" finds due process satisfied

when jurisdiction is asserted "over a person whose conduct outside the nation's territory threatens

---

[34] A robust majority of Circuits have assumed that it does. *See, e.g.*, *United States v. Noel*, 893 F.3d 1294, 1305 (11th Cir. 2018), *cert. denied*, 140 S. Ct. 157 (2019); *United States v. Murillo*, 826 F.3d 152, 157 (4th Cir. 2016); *United States v. Umeh*, 527 F. App'x 57, 63 (2d Cir. 2013); *United States v. Lawrence*, 727 F.3d 386, 396 (5th Cir. 2013); *United States v. Perez Oviedo*, 281 F.3d 400, 403 (3d Cir. 2002); *United States v. Davis*, 905 F.2d 245, 248 (9th Cir. 1990). However, neither the Sixth Circuit nor the Supreme Court has interpreted the Fifth Amendment to restrict congressional criminalization of extraterritorial conduct or the conferral of jurisdiction for such prosecutions. *See also In re Hijazi*, 589 F.3d 401, 408 (7th Cir. 2009) (declining to decide whether "the question of how far a statute reaches out to address conduct undertaken outside the United States" presented an issue of statutory coverage or "as something going to the court's very power to act"); *United States v. Ali*, 718 F.3d 929, 944 (D.C. Cir. 2013) ("We need not decide [ ] whether the Constitution limits the extraterritorial exercise of federal criminal jurisdiction."). As to proscription of American citizens' extraterritorial conduct, the Supreme Court has found no constitutional limit; rather, disputes on that topic depend "on construction of exercised congressional power, not the limitations upon that power itself." *Steele v. Bulova Watch Co.*, 73 S. Ct. 252, 254 (1952). Despite the Circuit consensus (which the Court here follows), precedent provides some reason to doubt that the Supreme Court or Sixth Circuit would follow suit. *Cf. United States v. Verdugo-Urquidez*, 110 S. Ct. 1056, 1062–63 (1990) ("[N]ot every constitutional provision applies to governmental activity even where the United States has sovereign power. . . . [W]e have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States. [Indeed,] our rejection of extraterritorial application of the Fifth Amendment was emphatic[.]"); *id.* at 1064 (Certain cases "establish [ ] that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country. . . Respondent is an alien who has had no previous significant voluntary connection with the United States, so these cases avail him not."); *id.* at 1065 (rejecting Fourth Amendment application to search in Mexico and noting "deleterious consequences" of granting Constitutional protections to aliens acting abroad: "Were respondent to prevail, aliens with no attachment to this country might well bring actions for damages to remedy claimed violations of the Fourth Amendment in foreign countries or in international waters.").

the nation's security." *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999). Alternatively, under this rubric, "a state has jurisdiction to prescribe and enforce a rule of law in the territory of another state to the extent provided by international agreement[.]" *Id.* The instant prosecution satisfies both potential predicates. As alleged in the indictment, laundering of funds thimblerigged from American victims for purposes of concealing or promoting such swindling unquestionably risks domestic security. *Cf. United States v. Bowman*, 43 S. Ct. 39, 41 (1922) (noting "the right of the government to defend itself against obstruction, or fraud wherever perpetrated"). Further, given Nistor's presence before the Court, and the terms of the United States's extradition treaty with Romania, the Court sees no reason to doubt that this prosecution falls within the ambit of that international accord. *See, e.g.*, Extradition Treaty with Romania & Protocol to the Treaty on Mut. Legal Assistance in Criminal Matters with Romania, S. Treaty Doc. No. 110-11, 2007 WL 4911612, at *14 (Sept. 10, 2007) ("If the offense has been committed outside of the territory of the Requesting State, extradition shall be granted, subject to the other applicable requirements for extradition, if the laws of the Requested State provide for the punishment of an offense committed outside its territory in similar circumstances.") (ratified Sep. 23, 2008); *cf. id.* at *24 ("The United States of America and Romania shall provide assistance under this Article **with respect to money laundering**[.]" (emphasis added)).

The Second Circuit (and others) hold that due process, for extraterritorial applications of federal criminal law, requires a "sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." *Al Kassar*, 660 F.3d at 118. But, "[w]here Congress expressly intends for a statute to apply extraterritorially . . . the burden is a heavy one for a defendant seeking to show that extraterritorial application of the statute violates due process." *United States v. Epskamp*, 832 F.3d 154, 168 (2d Cir. 2016) (quotation marks

omitted). The *Epskamp* court found the subject defendant's wholly extraterritorial conduct, accompanied by no intent "to cause harm in the United States[,]" had a sufficient domestic nexus:

> The United States plainly has an interest in prosecuting narcotics conspiracies that dispatch participants into the United States in order to secure United States-registered aircraft with the deliberate intent to exploit the perceived authority and lawfulness of such aircraft. [And, defendant's lack of] . . . [k]nowledge of the aircraft's country of registration is legally irrelevant for purposes of due process.

*Id.* at 169.

For the same reasons that the charged conspiracy to promote or conceal illicit fleecing of Americans implicates domestic security interests, Nistor's alleged participation in that scheme (if proven) would establish a sufficient nexus to the United States and show that this prosecution is not arbitrary. As in *Epskamp*: "The United States plainly has an interest in prosecuting [money-laundering] conspiracies that [place] participants into the United States in order to secure United States-[victim funds] with the deliberate intent to" promote future or conceal antecedent bilking of Americans. 832 F.3d at 168; c*f. Al Kassar*, 660 F.3d at 119 ("If an undercover operation exposes criminal activity that targets U.S. citizens or interests or threatens the security or government functions of the United States, a sufficient jurisdictional nexus exists notwithstanding that the investigation took place abroad and focused only on foreign persons.").

Still other Courts of Appeals, including the Third and Fourth Circuits, eschew a "nexus" requirement and ask only whether the prosecution would be arbitrary or "fundamentally unfair[.]" *United States v. Perez Oviedo*, 281 F.3d at 403; *see Murillo*, 826 F.3d at 156 ("arbitrary-or-unfair framework"). This "more fluid" analysis generally considers factors such as whether a defendant

had "fair warning"[35] that his conduct was criminal (also, often, a consideration in Circuits that hew to the nexus approach) or whether the originating nation "consented to the application of United States law[.]" *United States v. Brehm*, 691 F.3d 547, 553–54 (4th Cir. 2012). As relevant to the question of arbitrariness, the Fourth Circuit reasoned that "it is not arbitrary to prosecute a defendant in the United States if his 'actions affected significant American interests'—even if the defendant did not mean to affect those interests." *Murillo*, 826 F.3d at 157.

As to fair warning—the only argument Nistor seriously presses in reply—again, the Court notes that since at least 2007, Romania has agreed to US extradition for crimes "committed outside of the territory of the" US under appropriate circumstances. Moreover, the US-Romanian Treaty was merely one step in the implementation of a US-European Union Treaty that reflects a far broader recognition of money-laundering's illegality.[36] Defendant seems to argue that a law directly regulating bitcoin transactions was necessary to provide him fair notice that he might be haled into court for the misconduct the Government alleges. The Court disagrees. The argument appears partly premised on Nistor's erroneous view that bitcoin transactions are *sui generis* and not subject to money laundering statutes. Not so, for the reasons already stated.

Nistor also claims that "during the time period covered by the Superseding Indictment, . . . Nistor was not subject to any legal obligation under EU law or Romanian law to perform any anti-money laundering risk assessments, implement any anti-money laundering policies, or

---

[35] Notably, "fair warning does not require that the defendants understand that they could be subject to criminal prosecution **in the United States** so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." *Murillo*, 826 F.3d at 157 (emphasis in original) (quotation marks omitted).

[36] *See generally* Mut. Legal Assistance Agreement with the European Union, S. Treaty Doc. No. 109-13 (June 25, 2003) (discussing the assurance of the involved "EU Member States" to "the United States that assistance would be available with respect to . . . money laundering [concerning] an extremely broad range of predicate offenses.") (ratified Sep. 23, 2008).

establish any know your customer norms as part of operating his cryptocurrency business." DE 540 at 4. True or not, the claim is of no consequence for the current inquiry. The Indictment does not charge Nistor with a regulatory violation or inadequate policy implementation; it charges him with knowingly participating in a conspiracy to launder fraud proceeds. Romania has criminalized money laundering since, at least, 2002.[37]

> The D.C. Circuit aptly summarized the thrust of the caselaw in this area:
>
> What appears to be the animating principle governing the due process limits of extraterritorial jurisdiction is the idea that 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'

*Ali*, 718 F.3d at 944 (quoting *Bouie v. City of Columbia*, 84 S. Ct. 1697 (1964)). When, as here, criminal conduct "is condemned universally by law-abiding nations, [the Court] see[s] no reason to conclude that it is 'fundamentally unfair' for Congress to provide for the punishment of persons" engaging in such crimes abroad. *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993).

The Court likewise sees no basis to conclude that a non-arbitrary prosecution (on the facts as alleged and supported in a proper indictment) consistent with principles of international law, bearing a satisfactory jurisdictional nexus, and supported by fair warning might, nonetheless, be constitutionally "unreasonable[.]" DE 459-1 at 22. Certainly, none of Nistor's cited cases support

---

[37] In 2012, the Romanian parliament republished Law No. 656 of December 7, 2002, (originally Published in the Official Gazette of Romania, Part I, No. 904 of December 12, 2002) addressing the prevention and sanctioning of money laundering. Published in Monitorul Oficial, No. 702 of October 12, 2012, *available at* http://legislatie.just.ro/Public/DetaliiDocument/40569 (last visited 3/8/2020). The Romanian law provides for imprisonment from 3 to 12 years for money laundering. *See id.* at Art. 29. No party directly addresses this provision and thus the Court finds it sufficient merely to note, from an unofficial electronic translation and without relying on the precise verbiage, that Romania appears to criminalize both concealment and promotion money laundering.

a contrary view. DE 459-1 at 23.[38] To the extent Nistor intended this argument as a distinct due process theory, the Court rejects it.

In 2013, the D.C. Circuit stated:

> [Defendant] has not cited—and we have not found—any case in which extraterritorial application of a federal criminal statute was actually deemed a due process violation. Although that does not mean such a result is beyond the realm of possibility, it does suggest [defendant's] burden is a heavy one, for he traverses uncharted territory.

*Ali*, 718 F.3d at 944.[39] The situation for Nistor has only marginally improved. Defendant cites a single district court finding that due process compelled dismissal of an indictment charging violations of two non-extraterritorial criminal statutes where:

> All of [the indictment-alleged] conduct occurred outside of the United States between three defendants who are not United States citizens, who never worked in the United States, and whose use of wires did not reach or pass through the United States.

---

[38] *United States v. Lloyds TSB Bank PLC*, 639 F. Supp. 2d 314 (S.D. N.Y. 2009) is a civil case in which the district court found subject-matter jurisdiction lacking because the Government failed to allege that the defendant was a co-conspirator in the US-based fraud scheme that sourced the funds allegedly laundered. *Id.* at 324. Thus, that non-binding decision is clearly inapt. Nistor's disingenuous summary of *United States v. Javino*, 960 F.2d 1137, 1143 (2d Cir. 1992) is likewise unhelpful. The *Javino* Court did not find "that is was unreasonable to prosecute foreign manufacturers of firearms even if the firearms were used in the United States[.]" DE 459-1 at 23. Rather, *Javino*—a case involving a homemade Dole juice-bottle bomb—concluded that a discrete provision of the National Firearms Act, 26 U.S.C. § 5822, governed "only devices made in the United States[,]" partly because of "the presence in the Act of **other provisions that expressly reach [ ] foreign-made devices that are imported into the United States**[.]" *Javino*, 960 F.3d at 1143 (emphasis added). *Europe & Overseas Commodity Traders v. Banque Paribas London*, 147 F.3d 118 (2d Cir. 1998), another civil case, actually supports the Court's conclusion. The *Banque Paribas* court indicated that reasonableness is measured by reference to "established principles of U.S. and international law." *Id.* at 131. Again, such principles support jurisdiction here.

[39] The D.C. Circuit seemingly overlooked *United States v. Perlaza*, 439 F.3d 1149 (9th Cir. 2006). *Perlaza* found it inconsistent with due process to exercise jurisdiction over individuals aboard a Colombian ship premised on aiding and abetting transport of "cocaine jettisoned from" another ship, where the Government "conceded at oral argument that it did not present any evidence indicating that" the drugs "had any nexus to the United States." *Id.* at 1169. Again, the Indictment allegations here plentifully provide the nexus that the *Perlaza* Court found lacking. Thus, this non-binding, distinguishable outlier is not of value to Nistor.

*United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1127 (N.D. Cal. 2015). Suffice it to say that

Nistor fails to show that this matter is even a distant cousin of the non-binding *Sidorenko* decision.

Here, the involved statutes clearly apply extraterritorially, and the Government undoubtedly

alleges domestic conduct, involvement of American citizens, as well as communications and

transactions into and out of the United States. Defendant's remaining efforts to cobble together

support for his due process claim are equally unavailing. *See* DE 459-1 at 21 (citing *Columbo-

Colella*, 604 F.2d 356 (5th Cir. 1979)[40] and *Abelesz v. OTP Bank*, 692 F.3d 638, 656–57 (7th Cir.

2012)[41]).

*Sub-Conclusion*

Nistor's dismissal effort largely depends on his "repeated[ ]" contentions that he "operated

a legitimate bitcoin exchange company in Romania" and that "[t]here are no allegations that Nistor

had any involvement in the fraudulent activity alleged in the Indictment." DE 459-1 at 20. Both

claims directly conflict with the charging document. For instance, as the Court explained in

rejecting Nistor's severance motion:

> Defendant claims that "nowhere in the indictment does the Government allege that
> Nistor was **involved in** any transactions that took place within the United States[.]"
> DE 461-1 at 4 (emphasis added). This is simply inaccurate. The Indictment alleges
> that Nistor was a member of a criminal enterprise that, *inter alia*, engaged in
> fraudulent "consumer-to-consumer sales in the United States" and utilized "third-
> party money launderers located in the United States[.]" DE 249 at ¶ 27(a) & (d).
> Defendant may not be charged with direct participatory involvement in these
> transactions, but the Indictment certainly charges that Nistor, by virtue of knowing
> RICO conspiracy participation, was involved in US-based crime. *See United States*

---

[40] *Columbo-Colella* does not mention the Fifth Amendment or due process.

[41] *Abelesz* is a civil case and the cited portion addresses personal jurisdiction. *See id.* This Court's
personal jurisdiction over Nistor is beyond fair dispute. *See United States v. Pryor*, 842 F.3d 441,
448 (6th Cir. 2016) ("Federal courts have personal jurisdiction over criminal defendants before
them, whether or not they are forcibly brought into court."); *see also United States v. Alvarez-
Machain*, 112 S. Ct. 2188, 2192 (1992) (describing broad rejection of due process argument
regarding exercise of personal jurisdiction following "forcible abduction").

*v. Sutton*, 642 F.2d 1001, 1017 (6th Cir. 1980) ("The object of a RICO conspiracy is to violate a substantive RICO provision here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity. . . . Under the statute, it is irrelevant that each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs." (quoting *United States v. Elliott*, 571 F.2d 880, 902–03 (5th Cir. 1978)).

DE 522 at 5 n.8. At trial, Nistor will be free to argue that his bitcoin exchange was entirely on the up-and-up. For purposes of the Rule 12(b) motion, however, the Court accepts the truth of the charges that Nistor's operation was decidedly illegitimate and that he knowingly participated in a scheme to launder proceeds of domestically perpetrated frauds. Those allegations are sufficient to overcome Nistor's due process argument.

## III.    CONCLUSION

For these reasons and under the applicable standards, the Court **DENIES** DE 456 and DE 459. One final note. Several of the Defendants' arguments are bound up with factual claims. The Court, per Circuit precedent, presumed the truth of the indictment allegations and declined to substantially delve into these factual components. To the extent any defense argument relied on such disputed facts, the Court's denial of the motion is **WITHOUT PREJUDICE** subject to renewal at, or after, trial. *See* Fed. R. Crim. P. 12(d) ("The court must decide every pretrial motion before trial unless it finds good cause to defer a ruling.").[42]

---

[42] "Good cause exists and a decision should be deferred if disposing of the pretrial motion requires making factual determinations that 'fall within the province of the ultimate finder of fact.' *United States v. Wilson*, 26 F.3d 142, 159 (D.C. Cir. 1994) (quoting *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986))." *United States v. Turner*, 842 F.3d 602, 605 (8th Cir. 2016).

This the 4th day of April, 2020.

Signed By:

_Robert E. Wier_

United States District Judge